STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
DOCKET NO. BCD-CV-2017-61 ✓

RICK SAVAGE, *et al.*,                  )
                                        )
            Plaintiffs,                 )
                                        )
    v.                                  )        ORDER ON DEFENDANT CENTRAL
                                        )        MAINE POWER COMPANY'S
CENTRAL MAINE POWER                     )        MOTION TO DISMISS
COMPANY,                                )
                                        )
            Defendant.                  )

This matter comes before the Court on Defendant Central Maine Power Company's

("CMP") motion to dismiss Plaintiffs' Complaint. Plaintiffs oppose the motion. Oral argument

was held on March 23, 2018. Counsel for both parties appeared and were heard.

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

This case was preceded by, and arises out of, *Central Me. Power Co.*, Appeal (By Central

Maine Power Company) of Consumer Assistance Division Decision No. 2015-C-2081, No. 2016-

00028, Order (Me. P.U.C. June 24, 2016) ("PUC Order I").[1] (Pl's Compl. ¶ 6.) This order of the

Maine Public Utility Commission ("PUC") affirmed a decision of the Consumer Assistance and

Safety Division ("CASD") of the PUC. PUC Order I required CMP to compensate Rick Savage,[2]

a private real estate developer, for installing underground service drops at his development projects

in the amount CMP would have incurred had CMP installed overhead service drops. (Pl's Compl.

¶ 6, PUC Order I at 4.)  A "service drop" is the service cable or other conductor providing

---

[1] The Court may consider this order, and other PUC orders mentioned herein, on a motion to dismiss because they are official public documents, central to the plaintiff's claim, and/or referred to in the Complaint. *See Moody v. State Liquor & Lottery Comm'n,* 2004 ME 20, ¶ 10, 843 A.2d 43.
[2] The Complaint refers only to a "customer" petitioning the CASD and the PUC; the written arguments of the parties and assertions made at oral argument confirm that this customer was Mr. Savage, a named Plaintiff in this lawsuit.

1

secondary voltage to the customer's service entrance equipment from a transformer or from a secondary voltage conductor location, which is located on the utility's distribution system or on a privately-owned line extension. (Pl's Compl. ¶ 2.) CMP is not allowed to charge a customer for a service drop up to 150 feet if it is located on the same side of the street as the distribution facilities and 200 feet if located on the opposite side of the street. 65-407 C.M.R. ch. 395, § 10(D). (PUC Order I at 4.) These service drops are generally installed overhead by CMP and owned by CMP. (PUC Order I at 4; *see* Pl's Compl. ¶ 5.) PUC Order I addressed a situation where a private developer, Mr. Savage, installed and retained ownership of underground service drops. (Pl's Compl. ¶¶ 4-6; PUC Order I at 3-5.) Prior to July 1, 2017, CMP's Terms and Conditions were silent on the cost treatment for developers who installed their own service drops underground, and it was CMP's position that CMP had no obligation to reimburse a developer for any portion of an underground service drop installed at the developer's discretion. (PUC Order at 1.) Explicitly noting that CMP's Terms and Conditions are silent on the issue, the PUC construed its own rule prohibiting CMP from charging for service drops up to a certain length, and found that "[b]ased on this [requirement], it is rational to apportion the costs between the developer and the utility[.]" (PUC Order I at 4.) PUC Order I directed CMP to reimburse Mr. Savage—and only Mr. Savage— for that portion of the installation cost that CMP would have paid had an overhead service drop been constructed. (PUC Order I at 4-5.) However, the PUC was explicit that it intended to "resolve the matter in a way that can be relied upon, should other developers also seek to construct and own their own service drops." (PUC Order I at 4.)

By subsequent order, the PUC set Mr. Savage's reimbursement rate at $455.09 per drop and ordered CMP to reimburse Mr. Savage a total amount of $30,946.12. (Pl's Compl. ¶¶ 11, 14.) *See Central Me. Power Co.*, Appeal (By Central Maine Power Company) of Consumer Assistance

2

Division Decision No. 2015-C-2081, No. 2016-00028, Order at 5 (Me. P.U.C. October 3, 2017) ("PUC Order II"). The Complaint does not allege that CMP has failed to pay Mr. Savage as required under the PUC Orders. (*See generally* Pl's Compl.) Final decisions of the PUC are reviewed on appeal by the Law Court. 35-A M.R.S. § 1320(1), (6). Based on the pleadings and statements made by counsel at the oral argument it is evident that neither PUC Order has been appealed from.

Since July 1, 2017, CMP's Terms and Conditions now provide that: "The Owner shall be fully responsible for the entire costs of any service drops (overhead or underground) constructed by Owner and CMP shall have no obligation to reimburse Owner or any other entity for the cost that CMP would have incurred had the company instead installed an overhead service drop itself." *Central Me. Power Co.*, Revisions to Terms and Conditions 7.3 Requirements for Owner-Constructed Lines and Requirements for Customer-Owned Line Extensions, No. 2017-00072, Tariff §7.3(B)(1) (Me. P.U.C. June 1, 2017). CMP claims it was invited to make this change in PUC Order I, which stated that "[i]f CMP wishes to revisit its Terms and Conditions and propose revisions to explicitly address the facts presented here, this decision does not preclude such a process." (Def's Mot. Dismiss 4-5; PUC Order I at 4.) At the oral argument, it was brought to the Court's attention that the PUC has commenced an investigation into this rule change arising out of the Legislature's consideration of a bill that would effectively codify as statute the apportionment ordered in PUC Order I. *Me. Pub. Utils. Comm'n*, Inquiry into the Installation and Ownership of Service Drops, No. 2018-00049, Notice of Inquiry (Me. P.U.C. March 1, 2018). The Court takes judicial notice that the bill, L.D. 1729 (128th Legis. 2017)[3], remains pending during

---

[3] The Court may likewise consider this legislative document on a motion to dismiss as it is an official public document. *See Moody,* 2004 ME 20, ¶ 10, 843 A.2d 43. Furthermore, a copy of the bill was presented to the Court without objection as to its authenticity or otherwise at the oral argument.

3

summer recess. M.R. Evid. 201(c).

Plaintiffs allege that PUC Order I and PUC Order II require CMP to reimburse all customers who installed underground service drops prior to June 1, 2017 at the rate of $455.09 per drop, the average cost that CMP would have incurred had CMP installed overhead service drops for those customers. (Pl's Compl. ¶ 5.) Plaintiffs further allege that CMP has failed to notify such customers that they may be entitled to reimbursement and failed to reimburse any affected customers. (Pl's Compl. ¶¶ 8-9.) The named plaintiffs are representatives of a putative class of similarly situated CMP customers, *i.e.* customers who installed underground service drops at their own cost. (Pl's Compl. ¶¶ 15-17, 27-42.)

In their Complaint, Plaintiffs seek recovery for negligence (Count I) (Pl's Compl. ¶¶ 43-50), breach of contract (Count II) (Pl's Compl. ¶¶ 51-59), unjust enrichment (Count III) (Pl's Compl. ¶¶ 60-66), quantum meruit (Count IV) (Pl's Compl. ¶¶ 67-72), and breach of statute (Count V) (Pl's Compl. ¶¶ 73-78).

## DISCUSSION

CMP's motion opens by purporting to be brought pursuant to M.R. Civ. P. 12(b)(6). (Def's Mot. Dismiss 1.) Although the bulk of the briefing on this motion is targeted at a traditional M.R. Civ. P. 12(b)(6) analysis testing the legal sufficiency of the causes of action alleged, CMP raises an alternative ground for dismissal in the opening paragraph to its memorandum of law in support of its motion to dismiss: that the Complaint "does not raise judicially cognizable claims for relief and, if anything, raises matters best resolved before the agency having jurisdiction over electric utilities and the rates and terms that they charge to customers, employing the consumer complaint process designed for that purpose." (Def's Mot. Dismiss 1.) This proposition is revisited later in CMP's motion, when it argues for the dismissal of Count V, and again in its reply brief. (Def's

4

Mot. Dismiss 13-14; Def's Reply Mot. Dismiss 1, 6.) It was the principal focus of CMP's argument at hearing, where Plaintiffs conceded that the PUC is an "alternative forum" but nonetheless argued that this Court had jurisdiction and was the better forum.

CMP does not necessarily challenge the Court's *jurisdiction* over the subject matter of this case. *See Homeward Residential, Inc. v. Gregor*, 2015 ME 108, ¶ 17, 122 A.3d 947 ("The word 'jurisdiction' most properly encapsulates only prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.") (quotations omitted). Rather, CMP argues that there are two forums that enjoy jurisdiction over this dispute—the PUC and this Court—and that between them, the PUC is the better forum. Thus, the issue presented is not whether the PUC has *exclusive* jurisdiction over the dispute, but rather whether the PUC should enjoy *primary* jurisdiction over the dispute.

"The doctrine of primary jurisdiction determines whether a court should refrain from deciding an issue that an agency with jurisdiction over the matter has not yet considered." *Town of Levant v. Seymour*, 2004 ME 115, ¶ 14, 855 A.2d 1159 (quotation omitted); *see also Quiland, Inc. v. Pub. Utils. Comm'n*, 2007 ME 45, ¶ 16, 917 A.2d 697 (citing *Christian Fellowship & Renewal Ctr. v. Town of Limington*, 2006 ME 44, ¶ 40, 896 A.2d 287). Although not identical, primary jurisdiction and the exhaustion of administrative remedies are doctrines "closely allied in basic function and concept. Each rests on the premise that an agency has the primary authority to make certain decisions deemed relevant to the determination of the controversy." *State ex rel. Brennan v. R. D. Realty Corp.*, 349 A.2d 201, 206 (Me. 1975) (citing *Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534 (1958)). A court's decision to exercise its jurisdiction (or decline to do so) based on primary jurisdiction is reviewed for an abuse of discretion. *Town of Levant*, 2004 ME 115, ¶ 17, 855 A.2d 1159.

All public utilities, including CMP, are subject to the jurisdiction, control, and regulation of the PUC. 35-A M.R.S. § 103(2)(A). "Regulating public utilities is in the first instance the function of the Legislature, not the judiciary. In its wisdom the Legislature delegated its entire authority to regulate and control public utilities to the Public Utilities Commission." *Mechanic Falls Water Co. v. Pub. Utils. Comm'n*, 381 A.2d 1080, 1090 (Me. 1977); *see also New Engl'd Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 470 A.2d 772, 778 (Me. 1984) (same). There are at least two procedural avenues by which a customer or group of customers can bring a grievance to the PUC. Individual customers can seek recovery through the consumer complaint process established through Title 35-A of the Maine Revised Statutes and implemented through the PUC rules.[4] *See* 65-407 C.M.R. ch. 815. The Maine Revised Statutes further provide for a "ten-person complaint" process analogous to a class action lawsuit. *See* 35-A M.R.S. § 1302(1). The PUC is required to investigate these complaints, and is entitled to order reparation pursuant to 35-A M.R.S. § 1308.

In this case, on appeal from the CASD, the PUC ordered CMP to reimburse only Mr. Savage, albeit while resolving the matter "in a way that can be relied upon, should other developers seek to construct their own service drops." (PUC Order I at 4-5, *see* PUC Order II at 5.) Plaintiffs point out that "[s]uch broad language does not foreclose the possibility that the [PUC] intended its ruling to apply to all customers in CMP territory." (Pl's Opp. Mot. Dismiss 4.) However, this point begs the question of how the PUC intended its ruling to apply—and whether this is a determination properly left to the PUC in the first instance.

In a closely analogous case, the PUC ordered CMP to "refund the amounts charged to its single phase line extension customers . . . back to July 1, 2000." *Central Me. Power Co.*, Investigation of Central Me. Power Co.'s Application of a "10%" Profit Adder to Private

---

[4] This was the process used successfully by Mr. Savage. *See* PUC Order I at 1.

Construction Projects, No. 2005-0520, Order (Me. P.U.C. Aug. 16, 2006), available at 2006 Me. PUC LEXIS 302 ("Profit Adder Case"). That case, like the one at bar, started when customer Peter Marion lodged a complaint with the Consumer Assistance Division ("CAD") of the PUC (the predecessor to the CASD) over a billing dispute with CMP. 2006 Me. PUC LEXIS 302, at *2. In the Profit Adder Case, the dispute was over the rate that CMP charged for a line extension to Mr. Marion's home in Baldwin, Maine. *Id.* Unlike service drops, CMP was then (and still is) allowed to charge for line extensions pursuant to its PUC-approved Terms and Conditions. *Id.* at *6. However, the CAD decided that the rate CMP charged exceeded the rate it could charge for the line extension to the extent that it included a 10% "profit adder." *Id.* at *3. CMP appealed this decision to the PUC, requesting that the PUC either "summarily reverse" the decision of the CAD, remand to the CAD to reconsider its decision in consideration of CMP's arguments on appeal, or treat the appeal as a request for investigation. *Id. See* 35-A M.R.S. § 1303. The PUC opened an investigation and ultimately affirmed the decision of the CAD. *Id.* at *4, 20. Citing 35-A M.R.S § 1308, the PUC ordered CMP to refund not only Mr. Marion but all affected customers. *Id.* at *25. The Profit Adder Case thus stands for the proposition that the PUC may open an investigation and order global relief pursuant to a CASD appeal.

In this case, the PUC decided in favor of Mr. Savage based on its interpretation of its own rules. (PUC Order I at 4.) Notably, this is not the grounds on which the Plaintiff class asks this Court to grant it relief, nor could it: it is indisputably beyond this Court's jurisdiction to interpret and apply the PUC's rules, either in the first instance or on appeal. 35-A M.R.S. § 1320(1). Instead, Plaintiffs' position is that because the PUC has already resolved the legal issue within its jurisdiction—whether CMP is required to reimburse a customer who installed his own service drops—and expressly indicated its intention to resolve the matter "in a way that can be relied upon,

7

should other developers seek to construct their own service drops[,]" there is no legal issue left within the primary jurisdiction of the PUC, only the factual issue of who is entitled to reimbursement, an issue well within this Court's jurisdiction and expertise.

Plaintiff's argument demonstrates that this Court *could* exercise its jurisdiction over the matter notwithstanding the doctrine of primary jurisdiction. However, given that the decision to exercise jurisdiction in such circumstances is discretionary, this Court must further determine whether it *should* decide the issues presented in this lawsuit rather than allowing the administrative agency with jurisdiction over the subject matter to do so in the first instance. *See Town of Levant*, 2004 ME 115, ¶ 17, 855 A.2d 1159 (trial court's decision to exercise jurisdiction where agency has concurrent jurisdiction over the matter reviewed for abuse of discretion). The Court has carefully considered both parties' arguments and decides that the circumstances of this case weigh in favor of declining to exercise jurisdiction and allowing the PUC to decide whether the Plaintiff class is entitled to compensation. Unlike other agency decisions, PUC decisions are appealed directly to the Law Court, suggesting a particularly strong legislative preference for the PUC to act as principal arbiter of disputes within its jurisdiction subject to review only by the state's highest Court. As noted above, motivated in part by L.D. 1729 (128th Legis. 2017) and in part by Mr. Savage's own prior case against CMP, the PUC has already launched an inquiry into the ways in which CMP charges for customer-installed underground service drops. *Me. Pub. Utils. Comm'n*, Inquiry into the Installation and Ownership of Service Drops, No. 2018-00049, Notice of Inquiry at 3 (Me. P.U.C. March 1, 2018). Mr. Savage was given notice of this inquiry as a party to the "recent CASD appeal docket." *Id.* at 5. The fact that the PUC can undertake its own inquiry, provide public notice and notice to interested parties like Mr. Savage and, importantly, the Office of the Public Advocate, shows how the PUC is better equipped to reach an informed decision on

8

the issue presented. On the other hand, as Plaintiffs pointed out at the oral argument, there is limited risk of competing directives resulting from the current investigation and this litigation, as the PUC investigation is more likely to provide "prospective relief" for Mr. Savage and the rest of the Plaintiff class in the form of a reversal of the rule change attributing the full cost of underground service drops to the customers who install them. Nonetheless, the Profit Adder Case shows that an investigation into CMP practices can result in both prospective injunctions and retroactive relief. In other words, it is not impossible that the PUC will require CMP to reimburse the Plaintiff class in its final order on the pending investigation. And, in any event, Plaintiffs are not foreclosed from pursuing retroactive relief pursuant to their own individual complaints through the CASD process or pursuant to a ten-person complaint. *See* 65-407 C.M.R. ch. 815; 35-A M.R.S. § 1302(1). PUC Orders I and II show that it is quite likely that Plaintiffs would prevail against CMP in that process; Mr. Savage to a certain extent has paved their way. *See* PUC Order I at 4 (explicitly stating its intent to "resolve the matter in a way that can be relied upon, should other developers also seek to construct and own their own service drops").

The Court therefore rules that the PUC has primary jurisdiction over the issues presented in this lawsuit and declines to decide those issues before the PUC has had an opportunity to consider them. CMP's motion is thus granted. However, this dismissal is without prejudice such that this Order does not operate as a final decision on the merits. Nothing in this Order should be construed as to foreclose Plaintiffs' ability to pursue relief in an alternative forum, such as the PUC.

## CONCLUSION

Based on the foregoing it is hereby ORDERED:

That Defendant Central Maine Power Company's motion to dismiss is GRANTED.

9